**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

UNITED STATES OF AMERICA,            )
                                                                   )
                              v.                                 )            **Criminal Action No. 2021-0011**
                                                                   )
MIKEY LUKE,                                                )
                                                                   )
                              Defendant.                    )
——————————————————————)

Attorneys:
**Melissa P. Ortiz, Esq.,**
St. Croix, U.S.V.I.
            *For the United States*

**Renee D. Dowling, Esq.,**
St. Croix, U.S.V.I.
            *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

            THIS MATTER comes before the Court on Defendant Mikey Luke's "Motion to Suppress Tangible and Derivative Evidence" ("Motion to Suppress") (Dkt. No. 26); the Government's Opposition thereto (Dkt. No. 30); the evidence and arguments presented at the suppression hearing; Defendant's Supplemental Briefing (Dkt. No. 55); and the Government's Response thereto (Dkt. No. 59). For the reasons that follow, the Court will grant in part and deny in part Defendant's Motion to Suppress.

## I.        BACKGROUND

            On March 30, 2022, the Government filed a two-count Indictment against Defendant, charging him with Possession of Marihuana with Intent to Distribute, in violation of 21 U.S.C. §§

841(a)(1) and 841(B)(vii);[1] and Maintaining Drug-Involved Premises, in violation of 21 U.S.C. § 856(a)(1). (Dkt. No. 60). On November 22, 2021, Defendant filed the instant Motion to Suppress, seeking to suppress "any evidence seized in violation of the Fourth [and Fifth] Amendment[s] to the United States Constitution." (Dkt. No. 26 at 1).[2]

During the subsequent suppression hearing held on February 11 and 17, 2022, the Government presented the testimony of five witnesses: Detective Lester Mitchell ("Det. Mitchell"), Virgin Islands Police Department ("VIPD"); Sergeant Darius George ("Sgt. George"), formerly of the VIPD Forensic Unit; Detective Teaclla Buckley ("Det. Buckley"), VIPD; Task Force Officer Aldemar Santos ("TFO Santos"), VIPD/HIDTA[3]; and Task Force Officer Moses President ("TFO President"), VIPD/HIDTA. At the hearing, Defendant testified on his own behalf and presented the testimony of four witnesses: Crime Scene Technician Gregory Daniel ("Officer Daniel"), VIPD; Seymour Prosper ("Mr. Prosper"), Defendant's coworker; Esther Ferris ("Ms. Ferris"), a social worker with the Department of Human Services ("Human Services"); and Natividad Osorio ("Ms. Osorio"), Defendant's neighbor. The following evidence emerged.[4]

Det. Buckley testified that on September 28, 2021, she and her partner, Det. Mitchell, received a call from 9-1-1 dispatch reporting child abuse and were dispatched to 21 Anna's Hope

---

[1] The Court notes that 21 U.S.C. § 841(B)(vii) is a citation error and does not exist. 21 U.S.C. § 841(b)(1)(B)(vii) prescribes penalties for violations of 18 U.S.C. § 841(a) involving "100 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 100 or more marihuana plants regardless of weight."

[2] Although the Motion to Suppress references only the Fourth Amendment, Defendant seeks to suppress evidence seized in violation of the Fifth Amendment as well.

[3] HIDTA is an acronym for High Intensity Drug Trafficking Areas—a joint task force between the Drug Enforcement Agency and local law enforcement. (Hr'g Tr. at 197).

[4] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for purposes of this pretrial motion, mindful that Defendant is presumed innocent until proven guilty. The facts discussed herein have not been proven beyond a reasonable doubt at this stage of the litigation.

in Christiansted ("the Property"). (Hr'g Tr. at 130-31). Based on a report that Det. Buckley authored, the call from dispatch was received at 11:10 a.m. *Id.* at 148. Det. Buckley testified that before she arrived at the Property the dispatcher told her that there was an eleven-year-old female at the residence, and that the minor had stated that her father was growing "weed"[5] in the backyard and that he had "guns buried in the backyard." *Id.* at 131-32. Det. Buckley testified that she and Det. Mitchell then traveled to the Property. *Id.* at 131.

Around the same time, Mr. Prosper, Defendant's coworker, arrived at the Property looking for Defendant. *Id.* at 240-41. Mr. Prosper testified that he arrived at the Property around 11:15 a.m. and stayed for twenty-five minutes. *Id.* at 248. When he arrived, Defendant was not there. *Id.* at 243. Mr. Prosper stated that he saw four women in casual clothes—two at the front of the door to the residence and two others in the residence. *Id.* at 245-47. Mr. Prosper also testified that he was told by an officer at the gate that he was not permitted to enter the property, and that when he tried to look in the yard, an officer told he could not be there, whereupon he departed. *Id.* at 246-47.

The Court also heard testimony from Ms. Osorio, Defendant's neighbor, who said she was at home on September 28, 2021, and saw officers on the Property. *Id.* at 205-06. Ms. Osorio testified that she saw Defendant's daughter "sitting on the porch with two female officers," and "saw the officers walking [the Property's] perimeter." *Id.* at 262. She explained that she saw officers walk between her property and Defendant's, "towards the back and also on the south side of his property." *Id.* She also testified that she saw officers on Defendant's back porch, and that Defendant was not at the residence when she made these observations, but returned later. *Id.* at 262-63.

---

[5] "Weed" is a slang term for marijuana. *United States v. Banks*, 628 F. Supp. 2d 811, 813 (N.D. Ill. 2009).

Officer Daniel testified that he was directed to go to the Property on September 28, 2021, by his supervisor, Sgt. George. *Id.* at 225-26. Officer Daniel said Sgt. George specified that "there was possibly a case of child abuse," and that Officer Daniel was "to photograph if the victim had any injuries." *Id.* at 226. Officer Daniel stated that he arrived at the Property at approximately 12:30 p.m., and that when he arrived he met Lieutenant Herman Lynch ("Lt. Lynch") and Officer Shera Joseph ("Officer Joseph"), who were on the roadway. *Id.* at 226. Officer Daniel testified that after he arrived, he spoke with Lt. Lynch and Officer Joseph, and that he thought it was Officer Joseph who told him that she observed what was possibly marijuana in the backyard. *Id.* at 235-37. Officer Daniel testified that Det. Mitchell and Det. Buckley were next to arrive. *Id.* at 234. Det. Mitchell testified that he arrived at 11:30 a.m., by which time Detective Naomi Daniel ("Det. Daniel") and Officers Johnson and Marisol Colon were also on the scene. *Id.* at 12, 67. Det. Buckley testified that she arrived around 11:35 a.m. *Id.* at 154.

When Det. Buckley arrived, she met Officer Joseph and Lt. Lynch on the roadway. *Id.* at 133. Det. Buckley testified that Officer Joseph told her that she had interviewed the minor, who had told Officer Joseph that her father had "weed" growing in the backyard and guns buried in the backyard. *Id.* After speaking with Officer Joseph, Det. Buckley, Det. Mitchell, and Det. Daniel went to the front doorway of the residence, where the minor was walking back and forth inside and outside of the home. *Id.* at 134. Det. Buckley testified that she was speaking with the minor when Defendant drove up to the residence in his vehicle; that the minor identified Defendant as her father upon his arrival; and that the minor told her that Defendant had "weed" growing in the backyard and there were guns buried under the ground. *Id.* at 134-35. Det. Buckley testified that she asked the minor about the guns, and the minor walked into the home and came back a short

4

time later with a black rifle scope. *Id.* at 136. Det. Buckley also testified that, prior to Defendant's arrival, the minor stated that she was home alone. *Id.* at 137.

Det. Mitchell testified that he spoke with the minor at the front door of the residence and that she told him that she was being abused by her father and did not want to stay at the residence any longer. *Id.* at 15. Det. Mitchell explained that, from the front door, he could look straight ahead to the back door of the residence—which was a sliding glass door—and through that glass door could see the marijuana plants. *Id.* at 16. He stated that he smelled a "strong odor of marijuana" and "[c]ould visually see marijuana plants in the backyard." *Id.* Det. Mitchell also stated that he spoke with Det. Buckley about contacting Human Services for the minor, and that Det. Buckley did so. *Id.* at 18. Det. Mitchell testified that "three or four" women from Human Services then arrived, and that he "gave them a rundown" on the "situation … at hand," at which point the women began speaking with the minor. *Id.* at 18-19.

Ms. Ferris, a social worker with Human Services, testified that on September 28, 2021, she received a call before noon about a possible case of child abuse. *Id.* at 253-56. She testified that she was with three other social workers when she received the call, and that the four of them then traveled to the Property. *Id.* at 255. Ms. Ferris recalled seeing more than "three or four" VIPD officers at the Property, including at the front door of the residence, but she did not recall "everyplace else" that the officers were. *Id.* at 256-57. Ms. Ferris also testified that she made contact with the minor, and that she was with the minor until an adult came and picked up the minor. *Id.* at 257-58.

Sgt. George testified that he traveled to the Property on September 28, 2021, arriving at approximately 11:40 a.m. *Id* at 117. He testified that Defendant arrived at the Property five to ten minutes after his arrival, and that Defendant asked him, "What's going on? What's going on here?"

and identified himself as the owner of the Property. *Id.* at 86. Sgt. George then asked Defendant

for identification, which Defendant provided in the form of a driver's license. *Id.* at 86-87. Sgt.

George testified that he "basically stopped [Defendant] at the [Property's] fence," and that because

"officers were still interviewing the minor child . . .  I kept him there." *Id.* at 87-88. Sgt. George

stated that he then explained to Defendant that the reason the police were there was because the

minor had reported being abused and that there were drugs and guns on the property. *Id.* He stated

he then "told" Defendant to "wait here, until, you know, we get further clarification, and we'll

proceed," and that Defendant responded "[n]o problem" and stood there with him. *Id.*

Sgt. George stated that a few minutes later he asked Defendant if he would consent to a

search of the property, and told him that, in the alternative, "we [the police] could get a warrant."

*Id.* at 88-89. Sgt. George testified that Defendant said "[t]here's no problem. I will consent," and

that Defendant was "[n]oncombative" and "[t]here was no hesitation" before Defendant gave his

consent. *Id.* at 89. Sgt. George stated that his firearm was covered by his shirt at this time, and that

he never displayed or pulled his firearm on Defendant. *Id.* at 89-90. He also said he never raised

his voice. *Id.* at 90.

Det. Mitchell testified that he was also present when Defendant consented to the search of

the Property, and he characterized Defendant as "[c]alm and cooperative" at the time. *Id.* at 24.

Det. Mitchell further testified that his own demeanor was also "[c]alm and cooperative," and he

stated that none of the officers raised their voices to Defendant or pointed their firearms at

Defendant. *Id.* at 24-25. Det. Buckley testified that Det. Mitchell then filled out a consent to search

form, which she in turn showed and read to Defendant. *Id.* at 137. Defendant then signed the form,

followed by Lieutenant Naomi Joseph ("Lt. Joseph") and Det. Buckley. *Id.* at 137-38.

The consent form, Government Exhibit 2, states that Defendant was the owner or tenant of the Property. Gov't Ex. 2. It also provides:

> The undersigned, having been advised of his . . . constitutional rights to prevent the search of the above described premises, absent the presentation of a search warrant issued under a judge[']s signature . . . hereby knowingly, freely, and voluntarily waives his . . . constitutional rights to prevent a search, and further freely consent to the search of the above described premises[.]

*Id.* The form is dated September 28, 2021, and marked 12:56 p.m. *Id.*

Speaking on his own behalf, Defendant testified that when he returned to the Property, his residence "was surrounded with police inside and outside, all around." *Id.* at 270. He testified that he could not drive into his yard and stopped his car near his neighbor's property. *Id.* Defendant said that when he got out of his car an officer "pulled a gun on [him]" and asked him who he was. *Id.* at 272. Defendant testified that he told the officer he lived there, and that he tried to go into the yard but that the officer told him he could not and had to "stand outside the other property." *Id.* Further, Defendant testified that Det. Mitchell threatened him before he signed the consent form:

> I [Defendant] was told that your property has been searched, we've been inside, we saw the grow room, and all through your yard we saw all the weed in the yard. And if you [Defendant] don't sign this paperwork, we're going to get a search warrant, and we're going to tear the place up from limb to limb.

*Id.* at 271, 318. Defendant testified that he did not "want the house to get destroyed and stuff like that, so I signed it." *Id.* at 273. Defendant also testified that the form was read to him *after* he signed it, contradicting Det. Buckley's testimony. *Id.* at 275. Defendant stated that the officers who testified lied. *Id.* at 176.

Det. Buckley testified that after Defendant signed the consent form she had a conversation with him. *Id.* at 141. Det. Buckley said that Defendant asked her if he could call his cousin. *Id.* She said that she asked him why he wanted to call his cousin, and Defendant said that he wanted to call his cousin because he (Defendant) was "going to jail." *Id.* at 141. Det. Buckley said she then

asked Defendant why he believed he was going to jail and whether "there [was] anything else in the home that [the police] need[ed] to be aware of[.]" *Id.* According to Det. Buckley, Defendant replied that he had "weed in the home," and that when she then asked if that was all, Defendant replied that it was. *Id.* Det. Buckley testified that she again asked Defendant the reason he believed he would be going to jail, and that Defendant responded, "because I have more than I should." *Id.* Det. Buckley testified that she gave Defendant permission to use his cell phone to call his cousin so the cousin could pick up his daughter, and that she then walked away and went to remove Defendant's daughter. *Id.* at 141-42.

Sgt. George testified that after Defendant signed the consent form he told Defendant, "We know there's weed on the property," and asked Defendant if there were other things that he wanted to tell the officers about, for example "guns or anything like that." *Id.* at 92. Sgt. George stated he told Defendant he wanted to know this information to determine whether it was safe to have Defendant accompany the officers on a tour of the Property. *Id.* Sgt. George testified that Defendant replied "No there's nothing. Just weed. No guns," to which Sgt. George responded, "Okay . . . No problem. Let's go." *Id.* According to Sgt. George, Defendant then asked him if the officers had to take the weed, to which Sgt. George responded, "Yes." *Id.* Sgt. George testified that as he and Defendant were walking to the residence, Defendant stated that the police had taken his "weed" on a previous occasion. *Id.* at 93.

Sgt. George testified that when he and Defendant arrived "[a]t the threshold of the door . . . there was a strong odor of marijuana, weed, and there was a glass door at the rear of the—to the rear portion of the residence that you could see through, and there were plants that you could observe through the glass door on the porch outside." *Id.* Sgt. George testified that the plants appeared to be marijuana plants, which could be viewed from the front door. *Id.* 93-94. Det.

Buckley likewise testified that she followed Defendant into the residence, and that "from the time we walked in, I saw the reflection of marijuana reflecting off the glass," which indicated to her that there was marijuana in the "back." *Id.* at 142. She testified that she then walked to the back of the residence, where she saw "a large amount of marijuana plants in the backyard." *Id.* at 142. Sgt. George testified that he, Defendant, Lt. Joseph, and another officer also walked through the home to the back porch, where he observed a small room to his left, which Sgt. George said contained "lights, air condition, fans," as well as "a marijuana portion of a tree being dried or hanged." *Id.* at 94-96.

Sgt. George testified that he then asked Defendant if there was any more marijuana on the Property, and that Defendant responded, "Yes, in the rear," at which point Sgt. George "searched the curtilage of the rear of the residence." *Id.* at 96-97. At the rear, Sgt. George observed what appeared to him to be possible marijuana plants in pots in different areas throughout the Property. *Id.* at 97. He then walked into a wooden structure at the rear of the property, which contained pottery soil, shovels, buckets, and pots, and observed what appeared to be marijuana plants near the structure.[6] *Id.* at 104-07. Sgt. George testified that he and Defendant walked the Property for approximately fifteen minutes, during which time Defendant was not handcuffed and was "calm, cool . . . No shouting, no cursing, nothing." *Id.* at 113-14. Sgt. George testified that at one point Defendant was telling the officers about the structure and where plants were, and that Sgt. George and Lt. Joseph were speaking with Defendant about using the property to "plant fruits . . . something that you could basically use in the community rather than marijuana." *Id.* at 105.

---

[6] The Government offered several photographs of the Property, which were admitted into evidence based on Sgt. George's testimony. (*See, e.g.*, Gov't Ex. 11 (showing plants in an area next to the wooden structure); Gov't Ex. 12 (showing plants near the wooden structure under a canopy with lights and extension cords)).

TFO Santos testified that on September 28, 2021, he was called to the Property "to investigate a marijuana cultivation case." *Id.* at 169. TFO Santos further testified that his involvement in the investigation began after Defendant had given his consent to search the residence and the plants had been collected and placed "in the back of a police vehicle." *Id.* at 176. TFO Santos stated that he received the plant counts and placed Defendant under arrest, prior to which Defendant was not handcuffed. *Id.* at 176, 195. TFO Santos later determined that the plants were marijuana plants based on a field test and took Defendant to the District Court, where the HIDTA Task Force office is located. *Id.* at 177-79.

TFO President testified that he and Task Force Officer Dave Wyrzykowski then interviewed Defendant. *Id.* at 201. TFO President further testified that before the interview, Defendant was presented with a form advising him of his rights, which he signed, waiving his right to have counsel present while he was questioned. *Id.* at 200-01. After the interview, Defendant was processed and made an initial appearance before Magistrate Judge George Cannon, Jr. *Id.* at 182.

## II.     APPLICABLE LEGAL PRINCIPLES

### A.  Fourth Amendment Search and Seizure

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. A search occurs when the government physically intrudes on constitutionally protected areas, or invades an expectation of privacy that society recognizes as a reasonable expectation. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013); *Kyllo v. United States*, 533 U.S. 27, 33 (2001).

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Likewise, courts regard curtilage—the area "immediately surrounding and associated with the

home"—as "part of the home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984); s*ee Estate of Smith v. Marasco,* 318 F.3d 497, 518 (3d Cir. 2003) ("Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property.") To fall under the Fourth Amendment's protection, curtilage must consist of an area that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (internal citation and quotations omitted). "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Collins v. Virginia*, 138 S.Ct. 1663, 1670 (2018).

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). However, where a search being challenged was made without a warrant, the burden shifts to the government to demonstrate that the warrantless search or seizure was conducted pursuant to an exception to the warrant requirement, which it must prove by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974). As relevant here, exceptions to the Fourth Amendment's warrant requirement include exigent circumstances, the plain view exception, and consent.

### 1. Exigent Circumstances

Under the exigent circumstances exception to the warrant requirement, a warrant is not required when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). For the exception to apply, there must be a "true emergency," and "once the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises." *United States v. Mallory*, 765 F.3d 373, 384

(3d Cir. 2014). The Supreme Court has explained that one such exigency is "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403; *see also Mallory*, 765 F.3d at 384 ("Exigent circumstances exist when officers . . . 'reasonably . . . believe that someone is in imminent danger[.]'" (quoting *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006))). "The Government bears the burden of demonstrating that exigent circumstances justified a warrantless [entry into a home], and that burden is heavy." *Mallory*, 765 F.3d at 382.

### 2. The Plain View Doctrine

Several conditions must exist for the plain view exception to the warrant requirement to apply. First, law enforcement must not violate the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990). Second, the "incriminating character" of the item in plain view must be "immediately apparent." *Id.* (citation omitted). Third, law enforcement must "have a lawful right of access to the object itself." *Id.* at 137. In discussing this exception, the Supreme Court has explained that if an article is in plain view, "neither its observation nor its seizure would involve any invasion of privacy." *Id.* at 133 (citations omitted). Thus, the exception "is addressed to the concerns that are implicated by seizures rather than by searches." *Id.* at 134.

### 3. Voluntary Consent

"Consent is an exception to the requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "Consent must be given voluntarily, and voluntariness may be gleaned from considering a range of factors." *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011) (internal citation omitted). Under the totality of the circumstances test, the Third Circuit has urged courts to consider factors such as "age, education, and

intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment." *United States v. Price*, 558 F.3d 270, 279 (3d Cir. 2009). The Third Circuit has also stated that "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions" are relevant. *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *see United States v. Gonsalves*, No. 19-cr-00011, 2020 WL 1170217, at *4 (D.V.I. Mar. 10, 2020) (assessing these factors).

### B.  Fifth Amendment *Miranda* Rights

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court established the now well-recognized legal principle that the Fifth Amendment prohibits the prosecution from using statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The *Miranda* holding is based on the recognition that "interrogation in certain custodial circumstances is inherently coercive," and thus suspects must be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the Fifth Amendment right against self-incrimination is preserved. *New York v. Quarles*, 467 U.S. 649, 654 (1984).

*Miranda* warnings are required when a suspect is both in custody and subject to interrogation. *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010). A suspect is in custody when "there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). When an "individual has not been openly

13

arrested when the statements are made, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'" *Id.* (quoting *Steigler v. Anderson,* 496 F.2d 793, 799 (3d Cir. 1974)). Additionally, "the relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (noting that the *Miranda* doctrine need only be enforced "in those types of situations in which the concerns that powered the decision are implicated," and inquiring whether the stop at issue "exert[ed] upon [the] detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights"). "This determination is objective, 'based on how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer*, 468 U.S. at 442). Courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, *would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave*." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (emphasis in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004)).

The Third Circuit has identified several factors that courts should weigh in determining whether an individual is in custody during questioning for purposes of the *Miranda* analysis. *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). These factors include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Id.* (internal citations omitted).[7] Courts should also consider "the information known by the officer[s] concerning the suspect's culpability," and "whether the officer[s] revealed [their] belief that the suspect was guilty." *Jacobs*, 431 F.3d at 105.

As to whether a suspect is subject to interrogation,

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police *should know are reasonably likely to elicit an incriminating response from the suspect*.

*Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (emphasis added). In contrast, "preliminary questions" are generally not considered interrogation as they do not pose the same potential for eliciting incriminating responses. *See United States v. Gutierrez*, 92 F.3d 468, 471 (7th Cir. 1996) ("Prior to or after arresting a suspect, law enforcement officers may ask preliminary questions as to identity, but they may not conduct a custodial interrogation."); *United States v. Hitselberger*, 991 F. Supp. 2d 130, 138 (D.D.C. 2014) ("Standard questions that ask the suspect basic identifying questions are unlikely to elicit incriminating responses and are thus not coercive enough to establish an 'interrogation."). Further, spontaneous statements made "without prompting are not implicated by *Miranda* because they are not a product of custodial interrogation." *United States v. Rose*, 189 F. Supp. 3d 528, 547 (D.V.I. 2016) (citing *United States v. Young*, 233 F. App'x 114, 115 (3d Cir. 2007)).

An exception to the requirement to provide a suspect with *Miranda* warnings is the public safety exception. "Under this narrow exception, the police do not need to give the *Miranda*

---

[7] Other Courts of Appeals have adopted similar factors. *See, e.g., United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000); *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004); *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).

warnings before asking a suspect questions that are necessary to protect the public or the police from immediate danger." *United States v. Duncan*, 308 F. App'x 601, 605 (3d Cir. 2009). The exception applies if it would have been "objectively reasonable for the officer to believe that asking the question was necessary to protect the public or police from immediate danger." *Id.* In determining whether the exception applies, courts must examine the "totality of the circumstances." *Id.*

### III.   DISCUSSION

### A.  Fourth Amendment Search and Seizure

Defendant argues that the police violated his Fourth Amendment rights by trespassing into a protected area—his home and its curtilage—without either obtaining a warrant or satisfying a warrant exception, meaning that the "fruits of their search must be suppressed." (Dkt. No. 26 at 4). Further, Defendant argues that his consent to search "was not voluntary or came without authority." *Id.*

The Government argues that police officers responded to the minor's 9-1-1 call, and in the course of interviewing the minor, officers observed in plain view from the home's doorway what appeared to be marijuana plants in the rear of the home. (Dkt. No. 30 at 1-2). The Government argues that the subsequent search of the residence and its curtilage was justified even without Defendant's consent. Alternatively, the Government maintains that the search of the residence and its curtilage was permissible because Defendant "voluntarily consented in writing to the search of his home, to include curtilage." *Id.* at 5-6.

The Court finds that the search of the residence did not violate the Fourth Amendment in light of Defendant's voluntary consent.

**1. Exigent Circumstances Justified the Officer's Initial Entry to the Property**

The officers' initial entry to the Property was justified by exigent circumstances. Officers received information from 9-1-1 dispatch that a minor at the residence was claiming she was being abused and that there were drugs and guns at the residence. (Hr'g Tr. at 130-31). Officers responded and arrived at the residence within 25 minutes. *Id.* at 148, 154. It was objectively reasonable for police to believe that the minor required immediate assistance based on the minor's allegations of abuse and the presence of drugs and guns. *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (holding that the emergency aid exception "requires only an objectively reasonable basis for believing that a person within [the house] is in need of immediate aid." (internal citation omitted)). Defendant concedes that officers were authorized to be on the Property for purposes of checking on the safety and welfare of the minor. (Hr'g Tr. at 296-97).

The Court finds that, based on the 9-1-1 call, it was objectively reasonable for the officers to believe that there was a potential threat to a minor's safety. Thus, notwithstanding the protections provided to one's home and curtilage by the Fourth Amendment, the Court finds that the officers were lawfully at the front doorway of Defendant's residence when they went to check on the welfare of the minor. *See Brigham City*, 547 U.S. at 403 ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978))).

**2. The Plain View Doctrine Did Not Justify the Subsequent Search**

Once the minor's safety was assured by the officers' presence, whatever exigency had previously existed dissipated and any search of the residence that occurred thereafter could not be justified under the exigent circumstances exception. *See Mallory*, 765 F.3d at 384 ("[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further

17

search of the premises." (quoting *United States v. Murphy*, 516 F.3d 1117, 1121 (9th Cir. 2008))). The Government concedes as much. (*See* Hr'g Tr. at 285 (acknowledging that any exigent circumstances had dissipated once officers "met the minor at the front door")). Instead, the Government argues that the plain view doctrine justified their *search* of both the curtilage and the residence after officers saw marijuana plants in the backyard. (Dkt. No. 30 at 5-6).

The Government's argument fundamentally misconstrues the nature of the plain view exception. While in this case Det. Mitchell was at a lawful vantage point on the Property—*i.e.*, at the residence's front door—based on exigent circumstances, the mere ability to observe what appeared to be marijuana plants in the backyard from this lawful vantage point did not permit him or other officers to enter the backyard or residence to search and gather further evidence. *See United States v. Rivera-Padilla*, 365 F. App'x 343, 346 (3d. Cir. 2010) ("the plain view doctrine does not authorize searches"); *Collins*, 138 S.Ct. at 1675 ("The ability to observe inside curtilage from a lawful vantage point is not the same as the right to enter curtilage without a warrant for the purpose of conducting a search to obtain information not otherwise accessible."); *Simmonds v. Virgin Islands*, 53 V.I. 549, 559-62 (2010) ("Even if the officers, while standing in the public road or in [defendant's] front yard, observed violations situated within [defendant's] back yard, those observations would have merely provided probable cause, not authorization for a warrantless search of the curtilage."). Thus, the plain view exception could not have justified the warrantless search of the Property after Det. Mitchell (or any other officer) viewed what appeared to be marijuana plants from the front door of the residence.

### 3. Defendant Provided Consent to Search

The Government argues that Defendant's consent permitted officers to lawfully search his residence and curtilage without a warrant. (Dkt. No. 55 at 6). Defendant argues that the police

18

officers had already searched Defendant's residence and curtilage before receiving his consent in violation of his Fourth Amendment rights, or, in the alternative, that his consent was not voluntary. (Dkt. No. 26 at 4). In view of the Court's credibility determinations, the Court finds that the officers searched the Property after obtaining Defendant's consent, and that Defendant's consent was voluntarily given.

### a.     Conflicting Testimony and Credibility Determinations

The Court received conflicting testimony from the witnesses regarding: (1) whether officers searched the residence before Defendant signed the consent to search form; and (2) whether Defendant was threatened before he signed the consent to search form. Based on this conflicting testimony, the Court is required to make credibility determinations. *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) ("[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." (internal citation omitted)). Courts make such determinations by considering multiple factors, "including the witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case, and whether it withstands the 'common sense test.'" *United States v. Davis*, No. 12-cr-0068, 2014 WL 1394304, at *3 (W.D. Pa. Apr. 9, 2014) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)).

The Court credits the testimonies of Det. Mitchell, Sgt. George, and Det. Buckley regarding the officers' actions at the scene and the events that led officers to search the residence. First, the officers' testimonies were detailed and specific, evincing a clear recollection of events. *See United*

*States v. Christian*, No. 17-cr-00017, 2018 WL 891401, at \*5 (D.V.I. Feb. 14, 2018) (finding a witness's testimony credible based on witness's ability to recall event "in considerable detail").

Second, the chronology and sequence of events to which each officer testified was largely consistent across the testimonies. *Cf. United States v. Jackson*, 560 F. Supp. 2d 331, 336 (finding officers' testimonies during the suppression hearing not credible due to inconsistencies). Specifically, the collective testimony was that officers arrived in response to a call from 9-1-1 dispatch, which relayed a call from a minor who reported allegations of abuse, marijuana growth and guns buried at the Property, which was her residence. (Hr'g. Tr. at 130-31, 153-54, 82-83). Det. Mitchell and Det. Buckley then traveled to the residence, *id.* at 130-31, 154, and upon arriving Det. Buckley met Officer Joseph and Lt. Lynch on the roadway, *id.* at 133. After speaking with Officer Joseph, Det. Buckley approached the residence to speak with the minor. *Id.* at 134. The minor answered the door and Det. Mitchell and Det. Buckley spoke with the minor—who was home alone—from the front porch and at the front door to the residence. *Id.* at 14-15, 134. From this vantage point, Det. Mitchell could see what appeared to be marijuana plants in the backyard of the residence. *Id.* at 16. Shortly after Det. Mitchell, Det. Buckley, and Sgt. George arrived, Defendant returned to the residence. *Id.* at 19, 86, 134. Sgt. George stopped Defendant at the fence of the residence because the minor was still being interviewed. *Id.* at 87. A few minutes later, Sgt. George asked Defendant if he would consent to a search of the residence and stated that the officers would get a warrant to search if Defendant refused. *Id.* at 88-89. Defendant orally consented to Sgt. George, *id.* at 89, and Det. Mitchell and Buckley later read and filled out a consent to search form, which Defendant, Det. Buckley, and Lt. Joseph signed and dated, *id.* at 27-29, 91-92, 137-140. At no time did the officers draw their firearms, and the officers stated that Defendant was cooperative at the time. *Id.* at 24, 89, 145. Officers then walked through the residence and backyard

with Defendant, during which Defendant showed the officers different areas of his property. *Id.* at 29-30, 92-97, 142.

Third, the officers' demeanors on the stand were calm and collected, and each witness withstood cross-examination. *See Murphy*, 402 F. Supp. 2d at 571 (finding testimony credible, in part, based on witness's "demeanor on the stand," where witness's "version of the events . . . never wavered" even upon "vigorous and effective cross-examination").

Finally, the evidence presented at the hearing supported the officers' version of events. Specifically, the signed waiver of consent states that Defendant had "not been threatened, nor forced in any way." (Gov't Ex. 2). The time at which the waiver was signed, 12:56 p.m., coincides with the officers' chronology of events. *Id.*

In view of the foregoing, the Court finds credible and credits the testimony of the officers.

Conversely, based on Defendant's inconsistencies with the officers' credible testimony and his demeanor at the suppression hearing, the Court does not find credible Defendant's testimony that an officer in a red shirt pulled a gun on him when he returned home, or that Det. Mitchell threatened to tear up his home if he did not consent to the search. (Hr'g Tr. at 271-72). The Court also notes that Defendant's testimony is inconsistent with the waiver that he signed, which states that he "knowingly, freely, and voluntarily waives his . . . constitutional rights to prevent a search, and further freely consent[s] to search." (Gov't Ex. 2).

The Court also does not find credible Defendant's testimony that upon his arrival at the Property, an officer in a red shirt told him that the officers had already searched the residence. *Id.* at 273 ("He told me he had seen everything, he had been through the house, he done see the grow— the grow room, he walked through the yard, he seen everything that I had in there already."). Based on this testimony, Defendant argues that Officer Joseph searched the backyard before Defendant

arrived. *Id.* at 235-37, 293-96. However, the Court does not draw this conclusion from the testimony that the Court credits. Det. Buckley's testimony was that Officer Joseph had interviewed the minor, who was at the doorway when Det. Buckley arrived. *Id.* at 133-34, 151. Det. Buckley and Det. Mitchell further testified that from that vantage point one could view what appeared to be marijuana plants in the backyard. *Id.* at 16, 142-43. Accordingly, based on the testimony that the Court credits, the Court rejects Defendant's argument that Officer Joseph searched the backyard before Defendant arrived.

Ms. Osorio, Defendant's neighbor, also testified that from her residence approximately 200 to 500 feet away, she saw officers on the back porch and walking the perimeter, but did not see Defendant at the residence. *Id.* at 261-62. She testified that Defendant returned home after she saw officers walking the perimeter. *Id.* at 263. As noted, the Court credits the version of events as testified to by Det. Mitchell, Det. Buckley, and Sgt. George, whose testimonies and recall of events were specific and detailed; Ms. Osorio's testimony was less so. *See id.* at 261-68 (testifying that her residence was "maybe 200, 500 feet apart" from Defendant's; that she called Defendant "five or ten times" when she saw police at Defendant's residence; and that she recalled the date that she witnessed these events when Defendant's counsel "mentioned the date").

Finally, Mr. Prosper testified that before Defendant returned home, he saw women in the residence, who were not in police uniform and who he thought were with the minor. *Id.* at 243-46. Mr. Prosper's testimony is not inconsistent with evidence provided by Ms. Ferris, who testified that there were four social workers present at the residence. *Id.* at 255. Accordingly, the Court does not conclude, based on Mr. Prosper's testimony, that officers were witnessed inside the residence prior to Defendant returning to the residence.

In view of the foregoing, the Court concludes that Det. Mitchell, Det. Buckley, and Sgt. George's testimonies are consistent and "compatible with a 'common sense' evaluation" of the entire record. *Christian*, 2018 WL 891401, at *5 (quoting *Davis*, 2014 WL 1394304, at *5). Accordingly, the Court finds that the officers did not search the Property before Defendant signed the consent form. The Court also finds that Det. Mitchell did not threaten Defendant to coerce him into giving his consent to search the Property.

### b.   Consent to Search

In view of the credibility determinations above, the Court finds that the Government has met its burden of showing that Defendant voluntarily consented to the search of his residence.

At the time of his arrest, Defendant was 48 years old and—based on his hearing testimony—he appears to be at least of average intelligence. At the hearing, Defendant testified that there had been at least one prior occasion when he dealt with law enforcement at his home—a factor which the Third Circuit has considered when evaluating whether consent was voluntary. *See Price*, 558 F.3d at 279-80 (upholding district court's determination that defendant's consent was voluntary based on factors including the district court's determination of individual's age, intelligence, education, and that the defendant "previous experience with the criminal justice system"). Based on the testimonies of Det. Mitchell, Det. Buckley, Sgt. George, and Officer Daniel, which the Court credits, the Court finds that Defendant was advised of his constitutional rights when the consent form was read to him by Det. Buckley. (Hr'g Tr. at 141).

Det. Mitchell testified that his own demeanor at the time that Defendant provided consent was "[c]alm and cooperative," as was Defendant's, and that none of the officers raised their voices or pointed their firearms at Defendant. *Id*. at 24-25, 89-90. This militates in favor of a finding that consent was voluntary. *See United States v. Archibald*, No. 15-cr-00041, 2016 WL 3156939, at

*17 (D.V.I. June 3, 2016) (finding consent voluntarily given when, among other things, defendant had a "cool and calm demeanor," and consent was obtained in a non-confrontational setting). The fact that Sgt. George told Defendant that the officers would get a warrant if he did not consent did not render Defendant's consent involuntary. *See United States v. Mathurin*, No. 14-cr-00055, 2015 WL 394015, at *8 (D.V.I. Jan. 29, 2015) (holding that the defendant's consent was voluntary even though a law enforcement officer advised the defendant that there was sufficient evidence to obtain a search warrant, as the officer merely provided the defendant with an "appraisal of the realities" that he faced (quoting *United States v. Claus*, 458 F. App'x 184, 189 (3d Cir. 2012))). Further, after Defendant gave verbal consent, he then gave written consent. *Id.* at 137. Det. Buckley testified that she walked over to Defendant, introduced herself, and showed and read the consent form to him. *Id.*

Accordingly, based on a totality of the circumstances, the Court finds by a preponderance of the evidence that Defendant voluntarily consented to the search of the residence and curtilage.

### B.  Fifth Amendment *Miranda* Rights

Defendant seeks to suppress six statements that he made at the Property. (Dkt. No. 55 at 1). In response, the Government argues that the officers' questioning did not amount to custodial interrogation such that *Miranda* warnings were required. (Dkt. No. 59 at 3-9). The Government also argues, in the alternative, that if Defendant was entitled to *Miranda* warnings, the public safety exception applies. *Id.* at 4-5, 7-8.

The six statements are as follows.

First, Defendant seeks to suppress a question he asked Sgt. George prior to entering the residence with Sgt. George on the walk-through. Sgt. George testified that before entering the residence he told Defendant that he knew there was weed on the property, and then asked whether

there are other things on the property, "whether guns or anything like that?" (Hr'g. Tr. at 92). Defendant responded, "No, there's nothing. Just weed. No guns." *Id.* Sgt. George then said, "No problem" and "Let's go." *Id.* at 92-93. Defendant then asked Sgt. George "if [the police would] have to take the weed." *Id.* Defendant seeks to suppress only this final question. ("Statement 1").

Second, Defendant also seeks to suppress his response to a question Sgt. George asked while Defendant and the officers were conducting the walk-through. Sgt. George asked Defendant whether there was any more marijuana on the property, and Defendant responded, "Yes, in the rear." *Id.* at 96. ("Statement 2").

Third, Defendant seeks to suppress four statements he made to Det. Buckley prior to walking through the residence with the officers. After Defendant signed the consent to search form, Defendant asked Det. Buckley for permission to call his cousin on his personal cell phone. (Hr'g. Tr. at 141). Det. Buckley then asked him why he wanted to call his cousin. *Id.* According to Det. Buckley, Defendant responded, "because he's [Defendant] going to jail." *Id.* ("Statement 3"). Det. Buckley then asked Defendant why he was going to jail and whether there was "anything else in the home that [the police] need[ed] to be aware of," and Defendant responded, "he ha[d] weed in the home." *Id.* ("Statement 4"). Det. Buckley then asked, "Is that all?" and Defendant responded, "Yes." *Id.* ("Statement 5"). Det. Buckley then asked, "So what would be the reason you have to go to jail?" and Defendant responded, "because I have more than I should." *Id.* ("Statement 6").

As detailed below, the Court finds: (1) that Defendant was in custody when he made Statements 1-6; (2) that Statements 2 and 4-6, but not Statements 1 and 3, were the products of interrogation; and (3) that Statements 2 and 4-6 do not fall within the public safety exception. Accordingly, the Court will suppress Statements 2 and 4-6.

### 1.    Custody

Defendant argues that although he was not placed under arrest prior to TFO Santos' arrival, he was in *de facto* custody from the moment he arrived at the Property. (Dkt. No. 55 at 2). Based on a totality of the circumstances, the Court agrees that there was a restraint on Defendant's freedom of movement to "the degree associated with a formal arrest." *Leese*, 176 F.3d at 743.  In other words, Defendant's circumstances were such that a reasonable person in his position "would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

There is some evidence that would suggest that Defendant was not in custody. For example, the testimony that the court credits, and on which it relies, indicates that the officers did not use "coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movements." *Willaman*, 437 F.3d at 360. Moreover, it is generally true that when a suspect is questioned at his own home, this factor will weigh in the Government's favor, as the location is not the type of coercive setting that normally accompanies an interrogation. *See United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) ("We agree that 'an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.'" (quoting *Czichray*, 378 F.3d at 826). *But see Leese*, 176 F.3d at 743 ("It is also established beyond doubt that a custodial interrogation may occur outside the police station."); *Orozco v. Texas*, 394 U.S. 324, 326-27 (1969) (finding that subject was in custody notwithstanding that he "was interrogated on his own bed, in familiar surroundings[.]").[8]

---

[8] The exact length of time during which officers questioned Defendant is unclear, but the Court estimates that the period of time during which questioning took place was over half an hour but less than an hour. Defendant spoke with Sgt. George for a short period of time when he arrived—

Here, however, the totality of the circumstances compels a different result. The hearing testimony revealed that Sgt. George controlled Defendant's movements from the outset of Defendant's interaction with the officers. (Hr'g Tr. at 87-88). Sgt. George barred Defendant from entering the Property by "stopping him at the fence" and ordering him to "wait here," and "kept [Defendant] there with him" to avoid any interaction between Defendant and the officers who were still interviewing the minor inside the residence. Sgt. George continued to direct Defendant's movements by saying "Let's go" as they proceeded to walk around the Property. *Id.* at 87, 92. These circumstances militate in favor of a finding that Defendant was in custody.

In this regard, the Court finds *United States v. Aker* persuasive. No. 16-cr-00206, 2018 WL 501001 (M.D. Pa. Jan. 22, 2018). There, five police officers arrived at the defendant's home and directed and circumscribed her actions, including by explaining that they would "allow" her to get her children ready for school before subjecting her to questioning about the alleged fraud. *Id.* at *6. The court determined that "there is little doubt that Aker was under the control of the [police] because they did not explicitly note that Aker was free to leave, and because officers controlled Aker's actions by exercising authority over her actions at the outset of their interaction." *Id.* Likewise, the officers here also exerted control over Defendant's freedom of movement, which similarly weighs in favor of a finding of custody. *See United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) ("While an interrogation in a defendant's residence, without more, certainly

---

approximately five or ten minutes. (Hr'g Tr. at 86-88, 90). Defendant then orally consented to the search of the property and signed the consent to search form. *Id.* at 90-91, 137. After signing, Defendant had a short conversation with Det. Buckley, during which she asked him a few questions. *Id.* at 141. Sgt. George also had a short conversation with Defendant after he signed the consent to search form, during which Sgt. George questioned Defendant. *Id.* at 92. Officers then walked the property with Defendant for approximately fifteen minutes, during which time Sgt. George asked Defendant a question. *Id.* at 113-14, 96. Although the questions appear to have occurred over a period of time, the Court finds that this factor does not weigh in either party's favor given the seemingly intermittent nature of the questioning.

weighs against a finding of custody . . . the level of physical control the agents exercised over [the defendant] weighs heavily in the opposite direction" where the defendant "was escorted by agents on the three occasions that he was permitted to move.").

Further, the number of officers present at the Property—at least nine—weighs in favor of a finding of custody. *See id.* (finding custody where five police officers were present during questioning of defendant at his home); *Aker*, 2018 WL 501001, at *6 (finding custody where five police officers were present during questioning of defendant at her home, notwithstanding that the officers did not draw their weapons during the interaction). In addition, while the officers here did not inform Defendant that he was under arrest, they also did not inform him that he was free to leave. The Third Circuit has observed that where a defendant is "not told anything regarding [his] arrest, pro or con, this factor falls somewhat in [his] favor." *Jacobs*, 431 F.3d at 106.

Two additional factors are: (1) the information known by the officers with respect to Defendant's culpability prior to the questioning, and (2) the extent to which the agents revealed that belief to Defendant during the questioning. *United States v. Withey*, No. 17-cr-00016, 2018 WL 1440600, *4-*6 (D.V.I. Mar. 22, 2018). As described by the Third Circuit, "[t]he more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*, and vice versa." *Steigler*, 496 F.2d at 799 (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969)); *see also Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). Here, Sgt. George told Defendant, "We know that there's weed in the property," strongly suggesting to Defendant that he (Sgt. George) believed Defendant to be culpable. *See Jacobs*, 431, F.3d at 105.

In view of the foregoing, the Court finds that the words and actions of law enforcement indicate that Sgt. George and his fellow officers "would not have heeded a request to depart," *Leese*, 176 F.3d at 743, and that a reasonable person in Defendant's position would not have felt free to leave, *see Jacobs*, 431 F.3d at 105. Accordingly, the Court concludes that Defendant was in custody once confronted by Sgt. George upon Defendant's return to the Property—before Defendant made the six statements at issue.

### 2.    Interrogation

The Court next examines whether Defendant was subject to interrogation with respect to each of the six statements that he made while in custody.

Statement 1 ("[Whether the police] would have to take the weed"). Based on the evidence presented at the hearing, the Court concludes that Sgt. George did not elicit this question with direct questioning or "words or actions" that he should have known was "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. This interaction began when Sgt. George asked Defendant whether there were guns or the like on the Property. Defendant responded that there were not, "just weed." Defendant then asked, without any prompting, whether officers would have to take the illegal contraband, *i.e.*, the marijuana. The Court finds that this was a spontaneous question, and thus not the product of interrogation. *See Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *Rose*, 189 F. Supp. 3d at 547 ("[Statements made] without prompting are not implicated by *Miranda* because they are not the product of custodial interrogation."). Because Statement 1 was not the product of interrogation, it will not be suppressed.

29

Statement 2 ("Yes, [there is marijuana] in the rear"). This answer was elicited in response to a question from Sgt. George asking Defendant whether there was any more marijuana on the property. (Hr'g Tr. at 96). Because Sgt. George's question was reasonably likely to elicit an incriminating response, the Court finds that Statement 2 is the product of interrogation.

Statement 3 ("Because I am going to jail"). Defendant made this statement in response to Det. Buckley's question as to why Defendant wanted to call his cousin. *Id*. at 141. There is no evidence that officers on the scene had received any information about Defendant's cousin, and Det. Buckley's question followed a request that Defendant made to call his cousin. There is nothing to suggest that this question was reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 300-01. The Court therefore finds that Statement 3 is not the product of interrogation and will not suppress it.

Statement 4 ("[There is] weed in the home"), Statement 5 ("Yes, [marijuana is all there is]"), and Statement 6 ("Because I have more [marijuana] than I should"). After asking Defendant why he wanted to call his cousin, and Defendant's response that he was going to jail, Det. Buckley then asked Defendant why he was going to jail and whether there was anything else in the home that the police needed to be aware of. Defendant responded that "he ha[d] weed in the home." (Statement 4). Det. Buckley then asked, "Is that all?" and Defendant responded, "Yes." (Statement 5) Det. Buckley then asked, "So what would be the reason you have to go to jail?" and Defendant responded, "because I have more than I should." (Statement 6). These three questions to Defendant—which included, in effect, asking Defendant why he believed he was guilty of a crime—were reasonably likely to elicit incriminating responses. The Court therefore finds Statements 4, 5, and 6 to be products of interrogation.

### 3.   Public Safety Exception

The Government argues that the public safety exception to *Miranda* applies to Statements 1-6 because there was an "objectively reasonable need" for Sgt. George and Det. Buckley to ask Defendant the questions that prompted these statements—namely, to adequately protect police from any immediate dangers associated with the weapons on the Property that the minor had earlier reported. (Dkt. No. 59 at 8). The Court disagrees that the Public Safety exception applies to any of the four statements that remain at issue, Statements 2 and 4-6.[9]

The Public Safety exception is a "narrow exception," that applies only where an officer's questions are "necessary to protect the public or police from immediate danger." *Duncan*, 308 F. App'x at 605. The exception applies where officers ask questions intended to determine whether there are guns or weapons in the immediate vicinity. *See Quarles*, 467 U.S. at 659 (establishing the exception for these circumstances). For example, in *United States v. Powell*, the Third Circuit concluded that the exception was applicable where officers asked a suspect if "he had any weapons in the apartment" prior to searching his apartment pursuant to a warrant, and the suspect responded that he had a loaded gun in the hallway. 444 F. App'x 517, 519-20 (3d Cir. 2011).

Here, the Court finds *United States v. McConnell* instructive in light of the breadth of the officers' questions. No. 20-cr-00132, 2022 WL 1124822 (W.D. Pa. Apr. 15, 2022). *In McConnell*, the District Court found that a parole agent's questioning of the defendant did not fit within the narrow scope of the public safety exception where the agent asked the defendant whether there was "contraband" on the premises. *Id.* at *6. The Court reasoned that the agent did not specifically ask the defendant about "weapons" or "anything that could hurt" the agents, but rather used the

---

[9] Because the Court has previously determined that Statements 1 and 3 were not the products of interrogation, the Court does not address the exception with respect to those statements.

term "contraband," which was suggestive of a broader purpose to investigate and uncover parole violations. *Id.* at *6-*7.

Det. Buckley's questions to Defendant about why he was going to jail and whether there was anything else in the home that the officers needed to be aware of, and Sgt. George's question about any more marijuana on the Property, are not questions that fit within the narrow exception for questions "necessary to protect the public and police from immediate danger." *Duncan,* 308 F. App'x at 605. These questions—including the overly broad "anything else in the home[?]" question—did not have a "rational relationship" to addressing any potential danger posed by a weapon or other hazard on the premises. *See United States v. Benjamin,* 10-cr-00131, 2010 WL 2978042, at *5 (E.D. Pa. July 26, 2010) ("Because the public safety exception does not extend to questions posed only to elicit testimonial evidence from the defendant, the question must have a rational relationship to defusing the perceived danger.").

In view of the foregoing, the Court concludes that the public safety exception does not apply to Statements 2 and 4-6. The Court will therefore suppress these statements.

## IV.   CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Defendant's Motion to Suppress. The Court will suppress Statement 2 ("Yes, [there is marijuana] in the rear"), Statement 4 ("[There is] weed in the home,"), Statement 5 ("Yes, [marijuana is all there is]"), and Statement 6 ("[B]ecause I have more [marijuana] than I should"). The Court will otherwise deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date:   September 21, 2022

_____/s/_____
WILMA A. LEWIS
District Judge